## THE JEREMIAH GODFREY.

*(District Court, N. D. New York.  1883.)*

1. COLLISION—MUTUAL FAULT—DIVISION OF DAMAGES.
   As the evidence in this case shows that the collision was occasioned by the fault of both vessels,—the schooner in negligently entering the piers of the harbor, and the barge in occupying an improper position, in view of the time and the condition of the elements, and in maintaining such position, even if originally a proper one, after it became evident that disaster could only be averted by a change,—the aggregate of the damages to the vessels caused by the collision should be divided between the two vessels.

2. SAME—MOVING AND STATIONARY VESSELS—PRESUMPTION.
   Where a moving vessel collides with a stationary one, it is presumed that the former is in fault.

In Admiralty.

*H. D. Goulder*, for libelants.

*F. H. Canfield* and *Spencer Clinton*, for respondent.

COXE, J. The entrance to the harbor at Cleveland, Ohio, is through two nearly parallel piers, extending into the lake a distance of about 1,650 feet. They are 200 feet apart, except that they flare in order to make a wider entrance, the distance between them at the extreme end being 250 feet. On the evening of October 4, 1881, the Jeremiah Godfrey lay moored at the east pier, 300 or 400 feet from the end. The channel at this point is about 230 feet wide. The Godfrey is a large three-masted barge, 198 feet long and 33 feet beam. She depends upon other vessels to tow her, having no means of propulsion of her own. She took her position at the point de-

scribed during the afternoon of the preceding day, and remained there continuously, awaiting her steamer. At about 7:30 o'clock on the evening of the 4th, the schooner Moonlight appeared in the offing and signaled for a tug. She was loaded with iron ore and drew 14 feet of water. Her length of keel is 205 feet, her beam 33 feet 6 inches. The tug Dreadnaught started to bring her in, but failed to do so, owing to the bursting of a water gauge, which the engineer misinterpreted, supposing that a much more serious accident had occurred. The schooner was then in close proximity to the piers, had only her head-sails set, and was in imminent danger of going ashore. She attempted to enter alone, but in doing so took what, in nautical parlance, is termed a "lee wipe," and struck heavily against the west pier. The effect was to head her towards the east pier, with which she collided a few moments afterwards. She tore down, with her bowsprit or jib-boom, 80 feet of the elevated walk on the pier, and then sagged up the river until she fouled with the Godfrey. Her bow was held at the east pier by the fore-rigging of the barge, while her stern was chaffing and pounding on the west pier. She remained in this position some time,—from 20 to 40 minutes,—and was finally released by the Godfrey's lines being slacked, which enabled her to swing clear. The collision occurred about 8 o'clock. It was dark. The wind had been blowing fresh all that afternoon from the N. or N. E. across the starboard bow of the Godfrey, quartering with the river. The velocity of the wind is variously estimated; it was probably about 12 miles an hour. Towards evening it increased, and at 7 o'clock had reached its maximum of about 28 miles. Storm signals were raised at 8:30 P. M.

The libelants argue that the Godfrey was negligent in two particulars: *First,* in lying at an improper place; *second,* in maintaining her position when, by abandoning it, she could have released the Moonlight. The respondent disputes these propositions, and insists that the Moonlight was negligent in entering the harbor in the manner described.

At the outset the Moonlight is met with the presumption that where a moving vessel collides with a stationary one the former is at fault. Has she overcome this presumption? I think not. It is true that the action of the tug placed her in a distressing and hazardous situation. She was then about a quarter of a mile from the piers. Four courses were open to her: *First,* to wear about; *second,* to anchor; *third,* to go ashore; *fourth,* to enter the piers. Difficulties and dangers attended each; there was but a moment for decision; the exigency was great. It is by no means certain that she did not adopt the wisest course—the one attended by the least danger. But who was to blame for the unfortunate position in which the Moonlight found herself? Surely not the Godfrey. The Moonlight had practically rendered herself helpless before the tug had attempted to obtain control over her, and this, too, when she was so close

to the piers that any maneuver which she might endeavor to execute unaided was fraught with danger. Would the court be justified in saying that a vessel, having voluntarily placed herself in this perilous situation, is free from fault when she enters a narrow harbor at night, in a high wind, with head-sails only, striking first one pier and then the other, and so proceeding up the river, broadside on, until there is a collision with a stationary vessel? Obviously not.

It is insisted that it was not the fault of the Moonlight that she lost the tug. Granted. It was her fault, however, that, having lost the tug, she was in a position where disaster awaited upon any course she might pursue. It is also argued that the "lee wipe" was an unavoidable occurrence; but the evidence, I think, sufficiently establishes the fact that this was one of the dangers to be anticipated and avoided. It is not unusual for vessels to sheer in shoal water, and especially where bars are formed at the entrance to harbors.

Did the Moonlight enter the piers in the usual and proper manner, having taken all the precautions which good seamanship required? I am constrained to answer the question in the negative.

Turning now to the Godfrey, was she moored in an improper place? Respondent invokes in his defense an alleged custom for vessels to lie at this point. It is thought, however, that the evidence does not go as far in this direction as the respondent insists. It is undoubtedly true that it is usual for vessels in fair weather to drop down to the end of the piers, there to remain a reasonable time for the expected steamer. But it does not, therefore, follow that a vessel may with propriety lie there at night, with a heavy sea rolling and a high wind blowing from the north. Indeed, the evidence establishes the contrary. A vessel entering at such a time has a right to assume that the whole entrance, at best a narrow one, is free from obstructions. The last extension put upon the piers widened the entrance by 50 feet. It was evidently the opinion of the government engineers that the former entrance was too narrow, and the present one none too wide, for the purposes of navigation. If a boat 33 feet beam can lie with impunity at the east pier, where the channel is but 230 feet wide, another has the same right to lie directly opposite at the west pier, thus leaving a water-way of but 164 feet for incoming and outgoing vessels. Should two boats of equal dimensions with the stationary ones meet at this point, there would be but 98 feet of open water between the piers, and obviously insufficient room in which to maneuver.

At night the difficulty of distinguishing the lights on stationary, from those on moving vessels and on shore, would greatly add to the perplexities of a mariner attempting to make the harbor. In determining whether it was safe to enter or not, the fact that the channel was unobstructed would most surely be a very important factor in enabling him to reach an affirmative conclusion.

It never was intended that these channels should be blocked by

moored or anchored vessels. Accordingly, it has frequently been held that it was negligence to anchor in the track of vessels, at night, without taking extraordinary precautions against danger. It must be said, upon all the evidence of the case, taking into consideration the state of the wind and waves, the time, the warnings, and all the circumstances, that the Godfrey was at fault in lying where she did. But the evidence would seem also to warrant the conclusion that after the collision, the barge, with stubborn persistency, continued to hold her place even after she could have slacked her lines and permitted the schooner to escape without endangering her own safety. The result proved that she could have done this, and she might have done it many minutes before she did. It was her duty, after she became entangled, to render all the assistance in her power without hazard to herself. And yet the vessels were together for half an hour, or thereabouts, and during this time every appeal was made, and every argument used, to induce her to slack her lines, but in vain. Even after the Moonlight had her line out on the west pier, the Godfrey held on till parties on the pier commenced throwing her lines off.

It is argued that had the lines been thrown off before the schooner was made fast, the latter would have crowded the barge up the river and onto the west pier. It is by no means certain that this would have been so. If she had cut loose before the foremast fell and while the Moonlight's sails were still set, the tendency would be—the wind blowing across the piers—to force the schooner's bow directly away from the Godfrey the moment she was released. If done after the sails were down, the Godfrey, being the lighter boat, would surely drift faster. But the Godfrey was not required to cut loose; she could have slacked her lines and drifted up the river for some distance without any serious danger of being forced from her moorings. She might also have secured the services of the tug which was present and thus have escaped all the dangers which it is now argued she would have encountered. The duty which the law imposed upon her was not performed by lying securely at her moorings while a distressed vessel was likely to sink under her very bows for want of a few feet in which to swing clear.

The result of my examination is that the accident was occasioned by the fault of both vessels,—the one, in negligently entering the piers; the other, in occupying an improper position, in view of the time and the condition of the elements, and in maintaining it, even if originally a proper one, after it became evident that disaster could only be averted by a change. In the case of *The North Star*, 106 U. S. 17, [S. C. 1 Sup. Ct. Rep. 41,] the district court found one of the vessels alone in fault, it being a collision case. The circuit court adjudged both vessels guilty of negligence, and rendered a decree in favor of the one which suffered most, for so much of the damage as exceeded one-half of the aggregate damage sustained by both vessels. This decree was affirmed by the supreme court.

To quote from the learned and exhaustive opinion of Mr. Justice BRADLEY:

"If we go back to the test of the law, in the rules of Oleron, followed in the laws of Wisbuy and other laws, we find it expressed in substantially the same manner. The case is supposed of a ship coming into port negligently managed and striking a vessel at anchor in an improper position, so that both vessels are in fault and both are damaged. The rule says: The damage ought to be appraised and divided half and half between the two ships."

Here, then, the precise case developed by this evidence is stated hypothetically as furnishing the very best example for the operation of the rule just stated. That this rule is wise and equitable, and far in advance of the harsh principle of the common law which permits the slightest contributory negligence to defeat the action, can hardly be doubted.

There should be a decree providing for a reference to ascertain what the damages were which each vessel sustained after the Moonlight fouled the Godfrey, and dividing the aggregate amount so found between them.